UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NICHOLAS JOSEPH,

                  Petitioner,

    -vs-

THOMAS LaVALLEY


                  Respondent.
_____

**DECISION AND ORDER**
**No. 12-cv-00315(MAT)**


## I.   Introduction

*Pro se* Petitioner Nicholas Joseph ("Petitioner" or "Joseph") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered May 12, 2009, in New York State, Supreme Court, Monroe County (Justice Francis A. Affronti), convicting him, upon a non-jury verdict, of Aggravated Vehicular Assault (N.Y. Penal Law ("Penal Law") § 120.04-a[4]), two counts of Assault in the Second Degree (Penal Law § 120.05[4]), Leaving the Scene of a Personal Injury Accident (Vehicle & Traffic Law ("V&T Law") § 600[2][a]), Driving While Ability Impaired by the Combined Influence of Drugs or of Alcohol and any Drug or Drugs (V&T Law § 1192[4-a]), Criminal Possession of a Controlled Substance (Penal Law § 220.03), and Perjury in the First Degree (Penal Law § 210.15).

## II.   Factual Background and Procedural History

Petitioner was charged in a seven-count indictment with numerous offenses in violation of New York's Penal Law and V&T Law. The charges arose from an automobile collision that occurred on June 7, 2008, in which the vehicle Petitioner was driving struck a vehicle stopped in the left lane of Route 390 in Greece, New York.

### A.   The Non-Jury Trial

### 1.   The People's Case

In the early morning hours of June 7, 2008, Petitioner, an off-duty Sergeant with the Greece Police Department ("GPD") went to "Spenders Bar and Grill," where video-surveillance recorded him receiving numerous alcoholic beverages.  Trial Trans. [T.T.] 740, 774-780.[1]  At approximately 2:00 a.m., Petitioner left the bar driving his brother's Ford Fusion.  T.T. 313-314, 733.  As he traveled on Route 390 North, Petitioner was observed by a passing motorist speeding up and slowing down several times.  T.T. 253-255.

Meanwhile, Alexis Sharp ("Sharp") and her boyfriend Terence Green ("Green") were driving home on Route 390 North when Sharp's car stalled.  Sharp, who was driving, pulled over to the side of the road to call for assistance and activated her hazard lights. T.T. 197-198, 214-215.  Sean Pieken ("Pieken"), who was also traveling on Route 390 North that evening, observed the stalled car

---

[1]

Respondent appears to have separately paginated the transcripts, as they contain two sets of numbers (one at the top and one at the bottom).  To avoid confusion, the Court refers to Respondent's numbering (i.e., the numbers at the bottom of the transcript pages).

with its hazards flashing from "probably 30 yards away." T.T. 229, 243. Brian Benedict ("Benedict"), also traveling on Route 390 North, testified that he observed Sharp's stalled car in the left lane with its hazards flashing, and continued past it. T.T. 257. Passing motorist Amy Myers ("Myers") testified that she observed the stalled vehicle in the left lane from approximately a half mile away, and moved into the right lane to pass it. T.T. 293-294. Petitioner, traveling at a speed in excess of 75 miles per hour, slammed into the rear of Sharp's stalled car without ever applying the brakes. T.T. 946, 1075. Petitioner, whose head was bloodied from hitting his windshield, got out of his vehicle and surveyed the scene, talking to motorist Pieken who had stopped after the crash. T.T. 235-236, 345-346. Before police or emergency personnel arrived, Petitioner fled the scene. T.T. 237-238, 275-276.

Sharp and Green were taken to the hospital and treated for their injuries. T.T. 200-201, 216, 362, 364, 380-381. Sharp, who was 25 weeks pregnant, underwent an emergency C-section as a result of the accident. T.T. 196, 199, 817. The premature birth resulted in various health problems for the infant, many of which are of permanent consequences. T.T. 426-430, 435-436, 451. Sharp also suffered a herniated disc in her neck that required her to wear a neck brace for two to three weeks. T.T. 200-201. She continued to require pain medication for a month or two after she was discharged from the hospital, and still has a "big scar" on her left arm.

T.T. 201.  Green suffered a concussion, a strained neck, a sprained back, and needed one or two stitches on his head.  T.T. 216.

GPD Officer Brandon White, who arrived at the crash scene first, observed a Ford Fusion in the median between the north and southbound lanes of Route 390 with front end damage and its airbag deployed.  T.T. 309.  Upon closer inspection, Officer White observed blood on the airbag and blood and hair on the windshield of the car, which the police later determined was registered to David Joseph.  T.T. 313-314.  On the east side of the road, Officer White observed a Hyundai Elantra with damage to the rear end. T.T. 310.  Numerous police and other emergency personnel eventually arrived at the scene and searched the area looking for the driver who had fled the scene with an apparent head injury, but the search was unsuccessful.  T.T. 315, 390-391, 488-489, 501-502, 557, 578. GPD Officer Kevin McKeon inspected the crash scene and determined that "there were no indications of any braking" with respect to Petitioner's vehicle given the absence of skid marks on the road. T.T. 585-586.  Officer McKeon arranged for the Ford Fusion to be towed from the scene and taken to the impound lot of Don Walker Towing.  T.T. 337, 587.

Don Walker ("Walker"), the owner of Don Walker Towing, testified that the lot where the Ford Fusion was towed to is "fenced, big."  T.T. 828.  Walker testified that on the date of the accident, the lot would have been accessible to himself and to his son "and that's about it."  T.T. 829.  He testified that, to his knowledge, no one entered the lot and approached the Ford Fusion on

June 7 or 8.  T.T. 830.  He testified further that on June 8, he received a call from Petitioner and Petitioner came to Walker's home at about 1:30 p.m., at which time Walker gave Petitioner the key to the lot gate.  T.T. 831.  Petitioner returned the key about 20 minutes later.  T.T. 832.  Walker testified that was the only time that day the lot gate was opened.  T.T. 833.

On June 9, 2008, Kevin Burns ("Burns"), who worked for Miller Towing, received a call from a collision shop instructing him to pick up the Ford Fusion at Don Walker Towing, which he did. T.T. 517-518.  Burns testified that he transported the Ford Fusion to L&V Automotive, which is owned by Vince Bevilaqua ("Bevilaqua"). He also testified that his lot is surrounded by an 8-foot fence with barbed wire on top, and that the gate is open during business hours but is locked at night.  T.T. 530.  Bevilaqua testified that while the Ford Fusion was in his lot, he did not see anyone go inside the car, except for one of his employees who entered to retrieve a CD, and Dave Joseph who "got some stuff out of there." T.T. 534-535.  Bevilaqua also testified that "Mr. Kelly", a homeless man whom Bevilaqua knew to be a drug user, stayed on the premises.  T.T. 536, 544-545.

On June 11, 2008, two GPD Sergeants went to L&V Automotive to pick up the Ford Fusion after receiving word that the vehicle was part of a police investigation and that they were awaiting a search warrant concerning that vehicle.  T.T. 534, 617-618.  When the GPD Sergeants received word that a search warrant had been signed, they instructed Griff's Towing to begin towing the vehicle.  T.T. 620,

630.   The Ford Fusion was then taken to GPD Headquarters and secured in the impound lot.  T.T. 631.  The next day, the state police took possession of the vehicle and transported it to a secure garage at Troop E Headquarters in Canandaigua.  T.T. 633, 650.  On June 16, 2008, State Police Investigator Kenneth Smith processed the Ford Fusion.  T.T. 852-853.  He removed the power train control module, which monitors the vehicle's mechanical functions.  T.T. 859.  He also removed the airbag and secured it, and took several blood samples from the vehicle.  T.T. 873. Investigator Smith also recovered hair and tissue from the windshield, and collected the rear view mirror.  T.T. 873-891.

Subsequently, Nancy Scibetta ("Scibetta"), the DNA Technical Manager at the Monroe County Public Safety Lab, collected red/brown stains on the airbag from the Ford Fusion using swabs.  T.T. 1006, 1010, 1191.  After test screening showed the presence of blood, Scibetta performed a DNA extraction, in which she obtained a DNA profile from the blood.  She did not detect the profile of more than one individual.  T.T. 1016.  An investigator for the District Attorney's office then obtained two oral swabs from Petitioner, which Scibetta analyzed.  T.T. 1004-1005, 1017.  Petitioner's DNA profile matched the DNA profile from the blood.  T.T. 1021. Scibetta testified that the probability of randomly selecting an individual with the same DNA profile would be 1 in 183 quadrillion. T.T. 1023.

Dr. Jeanne Beno, Chief Toxicologist for the Monroe County Medical Examiner's Office, performed cocaine and cocaine metabolite

testing on the dried blood samples from the car.[2]   T.T. 129-130.
The results of the blood testing revealed the presence of cocaine
and the cocaine metabolite benzoylcgonine in some of the samples
taken from the Ford Fusion.   T.T. 28.   At trial, Dr. Beno testified
that the presence of benzoylecgonine in a sample "indicates that
cocaine has been metabolized."   T.T. 1202.   She testified that,
"[u]nder certain circumstances," benzoylecgonine could be found in
blood that had cocaine added to it outside of the body.   T.T. 1282-
1283.   She testified that the ratio of benzoylecgonine to cocaine
in the blood samples was "within the error of the method and
suggests that the ratio is the same in all of those samples."
T.T. 1220.   She testified further that this, in turn, suggests
"that the benzoyclecgonine was formed in the blood prior to the
blood being expelled onto the airbag."   T.T. 1228-1229.   She
concluded to a reasonable degree of certainty that "the cocaine in
the[] samples came from cocaine that was in the blood that was
deposited on the airbag."   T.T. 1227-1228.   Additionally, Dr. Beno
estimated that the cocaine was ingested "within an hour of the time
the blood was deposited, two hours at the most[,] but likely less
than one hour, within one hour."   T.T. 1230.   Dr. Beno also tested
for methylegcgonine and cocaethylene, but none was detected.

---

[2]

Prior to trial, the court conducted a <u>Frye</u> hearing with respect to Dr. Beno's
testimony.   <u>See</u> Hr'g Mins. of 02/18/09.   <u>Frye v. United States</u>, 293 F. 1013, 1014
(D.C. 1923) requires that the basis from which expert testimony is deduced must
be "sufficiently established to have gained general acceptance in the particular
field in which it belongs."   At the <u>Frye</u> hearing, Dr. Beno testified that the
procedures her lab follows for testing compounds in biological materials are
generally acceptable as reliable in the scientific community.   T.T. 97.   The
specific manner in which Dr. Beno performed her testing is discussed below as it
is relevant to Petitioner's habeas claims.

T.T. 1219.  With respect to methylegcgonine, Dr. Beno explained that "[w]hen blood is circulating in the body, it is metabolite that is rapidly cleared from the blood.  However, when blood is outside of the body, it becomes the predominant breakdown and often times the exclusive breakdown product of cocaine in the blood because it's not able to be cleared, so it builds up in the blood when blood is in liquified form outside the body."  T.T. 1219.  She explained that the absence of this metabolite in Petitioner's case suggests that the blood dried quickly.  T.T. 1220-1221.  Dr. Beno also testified that cocaethylene is a metabolite of cocaine that is formed in the liver when the user consumes alcohol at the same time.  T.T. 1220.  The absence of cocaethylene in Petitioner's case was, according to Dr. Beno, not surprising given the cocaine and benzoyclecgonine concentrations.  She explained that "if there was any cocaethylene produced, the expected concentrations of cocaethylene would be below the levels of sensitivity that we had in this methodology."   T.T. 1292.   Dr. Beno explained that cocaethylene takes time to build up in the body.  T.T. 1306-1307. Based on her testing, Dr. Beno concluded that "it's not a reasonable conclusion that somebody could have planted [the blood]."  T.T. 1295.  She explained that to have placed the cocaine and benzoyclecgonine on the airbag, someone would have had to "create a low concentration of these drugs in solution and be able to spray very specifically onto those areas that combination of drugs without contaminating the other areas with benzoyclecgonine as well as the cocaine and with creating a uniform enough spray

from spot to spot that you would not have extreme differences in the amount of cocaine recovered from each swatch that would suggest obviously that there was something wrong or some issue or problem there." T.T. 1296. Dr. Beno testified further that combined use of alcohol and cocaine will "counteract some of the effects of alcohol." T.T. 1032. She testified, however, this will "lead to impulsive, reckless behaviors. Together, the impairment of judgment is more severe." T.T. 1032. She explained that there would be a significant impairment of vision for the combined cocaine/alcohol user." T.T. 1302.

After the crash, at approximately 12:25 p.m. on June 7, 2008, GPD Sergeant Andrew Elmore, received a dispatch telling him to call Petitioner at home. T.T. 666. Sergeant Elmore did and spoke with Petitioner, who told him that he was the driver of the car that was involved in the accident "last night." T.T. 667-668. Petitioner told Sergeant Elmore that he had "blacked out" and did not remember anything other than having an accident somewhere on Route 390. T.T. 668. Without any prompting from Sergeant Elmore, Petitioner stated that, "[he] was coming back from the East End Fest. [He] worked security that night and [he] hadn't been drinking anything that evening." T.T. 668. Petitioner stated further "that he had just woken up and his wife had just told him to make that return phone call to the Police Department. He then went on to ask how the woman was. How the accident was." T.T. 669. Petitioner also told Sergeant Elmore that he did not remember how he got home.

T.T. 670.  Sergeant Elmore then called the GPD Chief to tell him that Petitioner was the driver of the car, who indicated that he already knew and that he had spoken to Petitioner and that it was Petitioner's wife who had brought him home after the accident. T.T. 679-680.

B.    **The Defense's Case**

The defense presented a number of witnesses.  Both of the doctors who examined Petitioner after the crash, Dr. Patrick Wilmont, an internist, and Dr. Joseph Mann, a neurologist, testified that they diagnosed Petitioner as suffering from post-concussive syndrome as a consequence of his head having hit the windshield and that it was not unusual for a person in such circumstances to not recall the traumatic event.  T.T. 977-990, 1254, 1264.

Dr. Marc Micozzi, a forensic pathologist, a professor at Georgetown Medical School, and a trained toxicologist, testified that the particular method used for testing the dried blood in this case was "experimental," and that "some of the experiment was done and parts . . . were not."  T.T. 1342.  Dr. Micozzi testified that because the testing was "experimental," "we just don't know about their reliability."  T.T. 1357.  He testified that in order to reach a conclusion as to whether the tests on the dried blood found in the car meant that there had been cocaine in Petitioner's bloodstream, one would have to take dried blood and add cocaine, and no metabolite, and then determine if metabolite is

produced, which had not been done in this case.  T.T. 1343, 1349, 1350.  Dr. Micozzi testified that the metabolite benzolecgogine can develop in blood outside of the body, and that it is not necessary to ingest cocaine for it to appear.  T.T. 1344.  He also testified that the metabolite cocaethylene, which is produced when there is the presence of ethyl alcohol and cocaine in the blood and which one would expect to find if a person had drank alcohol and ingested cocaine, but was not found in the testing of the blood from the Ford Fusion, can only be produced in the liver.  T.T. 1345, 1348.

Robert Burns ("Burns"), an accident reconstruction expert for the Rochester Police Department, testified that, given the situation of driving at night and unexpectedly being confronted with a stopped vehicle in his lane, Petitioner's reaction time, as evidenced from the time he took his foot off the accelerator, was within normal parameters.  T.T. 1449-1465.  Burns further testified that the collision involved the front right of the Ford Fusion and the left rear of the Hyundai, which is consistent with an angular collision.  T.T. 1468-1469.

C.   **Verdict and Sentence**

The court returned a verdict of guilty on all counts and sentenced Petitioner to an aggregate term of imprisonment of 3 1/3 to 7 years, with 2 years post-release supervision.  T.T. 1558-1559, 1579-1581; Sentencing Mins. [S.M.] 1579-1581.

**D.    The Direct Appeal**

In a counseled brief, Petitioner appealed his judgment of conviction to the Appellate Division, Fourth Department on the following grounds: (1) that the People failed to establish reasonable assurance of the unchanged condition of the Ford Fusion from the time of the crash until it was placed in police custody; (2) the trial court erred in admitting scientific opinion evidence based on a test never used before with dried blood of a kind not generally accepted in the field to establish that Petitioner possessed and ingested cocaine; (3) the guilty verdicts on counts 1-3 and 5-7 were against the weight of the evidence; (4) the People failed to prove that Petitioner committed the crime of leaving the scene of an accident where the serious physical injuries he was alleged to have "cause to know" about were not detected until six hours after the crash; (5) the People failed to prove that Petitioner committed the crimes of Aggravated Vehicular Assault and Assault in the Second Degree with respect to a fetus that was not yet born at the time of the alleged assault; (6) the guilty verdict for Aggravated Vehicular Assault should have been deemed a dismissal of the two counts of Assault in the Second Degree and the count charging Driving While Ability Impaired by Combined Influence of Drugs or of Alcohol and any Drug or Drugs because those counts are inclusory concurrent counts of Aggravated Vehicular Assault; (7) the sentences imposed were neither lawful nor appropriate; and (8) the sentence imposed was unduly harsh and severe.  <u>See</u> Resp't

Appendix B.  On July 2, 2010, the Fourth Department unanimously affirmed the judgment of conviction, and leave to appeal was denied on September 24, 2010.  <u>See</u> Resp't Appendices A, H.

### D.    Petitioner's Motion to Vacate

In a motion dated November 25, 2009, Petitioner moved, pursuant to N.Y. Crim. Proc. Law § 440.10, to vacate his judgment of conviction on the following grounds: (1) a <u>Brady</u> violation; and (2) newly discovered evidence.  <u>See</u> Resp't Appendix I.  The Monroe County Supreme Court denied Petitioner's motion on the merits.  <u>Id.</u> at p 7-8.  Leave to appeal was denied on June 22, 2010.  <u>See</u> Resp't Appendix X.

### E.    Petitioner's Coram Nobis Application

On or about July 2, 2011, Petitioner filed a motion for a writ of error coram nobis in the Fourth Department on the ground that he received ineffective assistance of appellate counsel because appellate counsel raised a weight of the evidence claim on direct appeal, rather than a legal sufficiency claim.  <u>See</u> Resp't Appendix M.  The Fourth Department summarily denied Petitioner's motion, and leave to appeal was denied on December 6, 2011.  <u>See</u> Resp't Appendix S.

### F.    The Federal Habeas Proceeding

On or about April 9, 2012, Petitioner filed the instant habeas corpus petition,[3] seeking relief on the grounds that: (1) he was

---

[3] In support of his habeas petition, Petitioner filed an Affirmation and Memorandum of Law ("Aff & Mem") (Dkt. No. 3).  This document contains portions of the record

denied his right to effective assistance of appellate counsel;
(2) that his due process rights to a fair trial were violated where
the People failed to establish reasonable assurance of the Ford
Fusion's unchanged condition from the time of the accident until it
was placed in police custody, thereby "rendering the evidence
regarding the contents of the vehicle inadmissible"; (3) a <u>Brady</u>
violation; and (4) that he was denied his due process rights to a
fair trial "where, after a <u>Frye</u> hearing, unreliable and novel
scientific evidence of a kind not generally accepted in the field
was admitted at . . . Petitioner's trial."  <u>See</u> Pet. ¶ 22A-D.
Respondent filed opposition papers to the habeas petition (Dkt.
No. 10), and Petitioner filed a Reply (Dkt. No. 11) thereto.

The same day Petitioner filed his habeas petition, he also
filed a motion to, *inter alia*, stay his habeas petition in this
Court while he exhausted an additional ineffective assistance of
counsel claim in state court.  In this motion, he asserted that
"[h]ad trial counsel had [certain scientific testing] performed[,]
it would have proven to the Court definitively that [he] [is]
actually innocent of the charges [he] was convicted of."  <u>See</u> Dkt.
No. 2 at p 1.  At that time, Petitioner indicated that he intended
to file a motion, pursuant to N.Y. Crim. Proc. Law ("CPL")
§ 440.10, to vacate his judgment of conviction, but had not done so
yet.  <u>Id.</u>  In a Decision and Order dated April 30, 2012, the Court

---

on appeal, as said portions are relevant to Petitioner's habeas claims.  For
purposes of consistency and because it is the responsibility of Respondent to
provide the Court with the state court record in the instant proceeding, the
Court cites to Respondent's Appendix throughout this Decision and Order.

(Hon. David G. Larimer) denied the request for a stay without prejudice subject to Petitioner re-filing the motion and showing that there is good cause for his failure to exhaust the new claim(s) and that said new claim(s) is/are potentially meritorious, pursuant to Rhines v. Weber, 544 U.S. 269 (2005). See Dkt. No. 5. The Court also instructed Petitioner that, "[s]hould [he] determine that he will proceed with the new claims, he must seek to amend his petition to include the new claims, provide the Court with a proposed amended petition, and seek stay and abeyance . . . ." Id. at 2.

On or about June 1, 2012, Petitioner submitted a renewed motion for a stay and abeyance,[4] in which he responds to the Court's April 30, 2012 Decision and Order by attempting to show "good cause" for his failure to exhaust his new ineffective assistance of trial counsel claim and that this claim is potentially meritorious. See Dkt. No. 9. In compliance with the Court's instructions, Petitioner also submits a proposed amended petition, in which he sets forth the original claims raised in the habeas petition, and his additional ineffective assistance of counsel claim.[5] Id. Respondent's opposition papers, filed on or

---

[4]

The document Petitioner filed is captioned an "Answer" and is entered on the docket sheet as a "Reply/Response." Given the substance of this document, however, the Court construes it as a renewed motion for a stay and abeyance.

[5]

The docket sheet reflects that Petitioner also filed a "response" on March 7, 2013, in which he indicates that his motion to vacate was apparently filed in the state court and is apparently pending before the Hon. Francis A. Affronti. See Dkt. No. 12.

about July 11, 2012, address the original claims raised in the habeas petition.  See Dkt. No. 10.

For the reasons set forth below, the Court denies Petitioner's request for a stay and his request to amend the habeas petition to include a new ineffective assistance of counsel claim.

A district court, confronted with a mixed petition containing exhausted and unexhausted claims, has the power to stay consideration of a state prisoner's petition for a writ of habeas corpus in order to permit the prisoner to exhaust his unexhausted claims.  Rhines, 544 U.S. at 277;  Zarvela v. Artuz, 254 F.3d 374 (2d Cir. 2001).  The granting of such stay is not a matter of course.

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

Rhines, 544 U.S. at 277.  Petitioner cannot meet this standard.

In this case, Petitioner has not shown "good cause" for his failure to exhaust his proposed ineffective assistance of counsel claim sooner.  The gravamen of his proposed new claim is that trial counsel was ineffective because he failed to "discover" certain "scientific data" that would have challenged the chain of custody

of the blood evidence and the testing procedure employed by Dr. Beno. He also asserts that trial counsel was ineffective because he "allowed Dr. Beno to testify unchallenged." Dkt. No. 9 at p 5. In an attempt to show "good cause" for his failure to exhaust this claim sooner, Petitioner explains that he retained an independent laboratory to perform testing relevant to this claim, and that said testing was not completed until April 25, 2012. See Dkt. No. 9 at p 4. However, the facts underlying the alleged ineffective assistance of counsel claim -- i.e., the chain of custody issue and the issue related to the reliability of the testing procedures performed by Dr. Beno -- were known to Petitioner at the time of his trial. Notably, both of these underlying issues were extensively litigated in the state courts at trial and on direct appeal, and, the chain of custody issue was indirectly raised in Petitioner's motion to vacate in the context of his Brady claim. In each instance, these issues were determined to be meritless (see discussion, supra). Further, Petitioner litigates both of these underlying issues as stand-alone claims in the instant proceeding, and neither warrant habeas relief (see discussion, infra). Petitioner accordingly has failed to show "good cause" for his proposed new ineffective assistance claim, and the Court finds it would be an abuse of discretion to stay the petition and hold it in abeyance while Petitioner exhausts this claim in the state court.

For the same reasons, the Court denies Petitioner's request to amend the habeas petition to include this claim.  Fed. R. Civ. P. 15(a) provides that leave to amend "shall be freely given when justice so requires."  Littlejohn v. Artuz, 271 F.3d 360, 362-64 (2d Cir. 2001).  However, where a proposed amendment is meritless or would be futile, federal courts should deny leave.  Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990).  Habeas courts may also deny leave "in order to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive."  Littlejohn, 271 F.3d at 363; see also Foman v. Davis, 371 U.S. 178, 182 (1962).  As discussed above, Petitioner has extensively litigated the issues underlying this proposed new claim, and he has offered no legitimate reason for his failure to raise the additional claim in his initial habeas petition and/or why he has waited until this late juncture to exhaust this additional claim.  The Court finds this method of piecemeal submission unfair to the opposing party -- which has already responded to the original petition -- and also to be a poor use of judicial resources.

Accordingly, the Court finds no reason to stay consideration of the petition while petitioner exhausts a new ineffective assistance of counsel claim, and no reason to permit him to amend his petition to assert said claim.  Petitioner's renewed motion to stay (Dkt. No. 9) is therefore denied.

The Court now proceeds to resolution of the original habeas petition.  For the reasons that follow, Petitioner's request for a writ of habeas corpus is denied and the habeas petition is dismissed.

## III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."  28 U.S.C. § 2254(b)(1)(A);  see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999);  accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995).  "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).  Even where, as here, a respondent does not challenge a Petitioner's claims on exhaustion grounds, the Court has an independent obligation to ensure that this requirement has been met, unless expressly waived by the State. See 28 U.S.C. § 2254(b)(3).  The Court finds that all of Petitioner's claims are exhausted and properly before this Court.

## IV.  The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the

Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Here, all of Petitioner's claims were adjudicated on the merits in the state courts, and the AEDPA standard of review applies. Under that standard, Petitioner's claims are meritless.

## V.    Analysis of the Petition

### 1.    Ground One

Petitioner argues, as he did in his coram nobis application, that he received ineffective assistance of appellate counsel because "[a]ppellate counsel failed to raise . . . the meritorious issue that there was insufficient evidence to prove the Petitioner guilty beyond a reasonable doubt of every element of the crimes charged." Pet's Aff & Mem at p 15; Pet. ¶ 22A. The Appellate Division summarily denied this claim. See Resp't Appendix P. Because the Appellate Division adjudicated this claim on the merits when it summarily dismissed Petitioner's coram nobis application, the AEDPA applies. See Sellan v. Kuhlman, 261 F.3d 303 (2nd Cir. 2001) (holding that a summary denial constitutes an adjudication on

the merits); see also Harrington v. Richter, 131 S.Ct. 770, 784-785 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). As discussed below, the claim is meritless and does not warrant habeas relief.

Courts must determine claims of ineffective assistance of appellate counsel by applying the Strickland standard. Smith v. Robbins, 528 U.S. 259, 285 (2000). Specifically, a petitioner must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. It is well-settled that "[a]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Id. at 288. "[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). To demonstrate prejudice for such an error, a petitioner must establish "that there was a reasonable probability that his claim would have been

successful before the state's highest court." Id. at 534 (internal brackets and quotation marks omitted).

As an initial matter, the Court notes that appellate counsel submitted a comprehensive 70-page brief on direct appeal in which he cogently argued eight points that were supported by citations to relevant portions of the record and to caselaw. See Resp't Appendix B. The Appellate Division, although unanimously affirming Petitioner's conviction, issued a lengthy decision, substantively addressing the majority of Petitioner's arguments. See Resp't Appendix A.

Nonetheless, Petitioner maintains that he received constitutionally deficient representation on direct appeal because "'the insufficiency of the evidence' issue should have been the primary focus of [his] appeal." Pet's Aff & Mem at 16. According to Petitioner, "[t]he first four . . . issues presented for appellate review were at the heart of the Petitioner's appeal, [and] [that] significantly interwoven in these four . . . issues was the fact that the evidence provided was clearly insufficient to prove the Petitioner guilty of every element of the all the crimes charged, beyond a reasonable doubt." Id. Petitioner's contention is meritless because Petitioner has not identified any issue, let alone a meritorious one, that appellate counsel failed to raise on direct appeal.

The record before this Court reflects that appellate counsel persuasively argued that the evidence was legally insufficient to support Petitioner's convictions of leaving the scene, aggravated vehicular assault, and assault in the second degree at Points IV and V of his brief.  See Resp't Appendix B at Points IV-V.  The Appellate Division rejected those arguments, finding that they were unpreserved for appellate review.  See Resp't Appendix A at 2-3.  With respect to Petitioner's contention that the evidence was legally insufficient to support his conviction of leaving the scene, the Appellate Division determined, in the alternative, that the claim was meritless.  See Resp't Ex. A at 2.  With respect to Petitioner's remaining convictions, appellate counsel argued that they were against the weight of the evidence at Point III of his brief.  See Resp't Appendix B at Point III.  The Appellate Division rejected this contention on the merits.  See Resp't Appendix A at 2.  While a claim of legal insufficiency is distinct from a claim of a verdict against the weight of the evidence, see People v. Danielson, 9 N.Y.3d 342, 348-349 (2007) (holding a "legally sufficient verdict can be against the weight of the evidence"), a determination by an intermediate appellate court in New York that a verdict is not against the weight of the evidence necessarily includes a determination of legal sufficiency.  See People v. Rogers, 94 A.D.3d 1246, 1250, n. 1 (3d Dep't 2012) (explaining that "we assess the sufficiency of the evidence as part of our weight of

the evidence review"); accord Danielson, 9 N.Y.3d at 349
("Necessarily, in conducting its weight of the evidence review, a
court must consider the elements of the crime, for even if the
prosecution's witnesses were credible their testimony must prove
the elements of the crime beyond a reasonable doubt."). Thus, the
Appellate Division necessarily reviewed and rejected Petitioner's
insufficiency argument. Petitioner has therefore failed to
demonstrate that appellate counsel omitted any issues -- let alone
"significant and obvious [ones] while pursuing issues that were
clearly and significantly weaker." Mayo, 13 F.3d at 533 (2d Cir.
1994). Thus, it cannot be said that there is a reasonable
probability that the outcome of Petitioner's appeal would have been
different had appellate counsel acted in the manner Petitioner
wished him to.

    Moreover, this claim fails insofar as it appears to be based
on Petitioner's belief that there was insufficient "proof" that
Petitioner possessed/used cocaine, and that appellate counsel did
not specifically pursue this argument in his brief. Pet's Aff &
Mem at 22. Again, however, Petitioner has failed to identify any
issue that appellate counsel failed to raise because this
particular issue was indeed argued at Points I and II of appellate
counsel's brief. At Point I of his brief, appellate counsel
asserted that the People's failure to establish reasonable
assurance of the Ford Fusion's unchanged condition from the time of

-24-

the crash until it was placed in police custody rendered the blood evidence against Petitioner insufficient to establish that he possessed/used cocaine.   At Point II of appellate's brief, appellate counsel argued that the admission of "unreliable and novel scientific opinion evidence [from Dr. Beno] of a kind not generally accepted in the field to establish that [Petitioner] had possessed and ingested cocaine was prejudicial error which deprived [Petitioner] of his right to a fair trial."  See Resp't Appendix B at Points I-II.   The Appellate Division addressed both of these claims, and determined that they were meritless.   The fact that Petitioner's appeal was ultimately unsuccessful does not render his appellate attorney's performance constitutionally deficient.   The record is clear that appellate counsel zealously advocated in Petitioner's defense by raising relevant legal issues and citing to the appropriate facts and caselaw in support thereof.

Accordingly, the Court finds no basis to conclude that Petitioner received ineffective assistance of appellate counsel, and his claim is therefore denied in its entirety.   Therefore, the state court's adjudication of this claim did not contravene or unreasonably apply clearly established Supreme Court law.   The claim is denied.

## 2.  **Ground Two**

Petitioner claims, as he did on direct appeal, that the trial court should not have admitted the blood evidence from the vehicle

Petitioner was driving at the time of the crash because the prosecution failed to establish a proper chain of custody that the condition of the dried blood from the interior of the vehicle was unchanged from the day of the crash to the day the blood samples were taken. See Pet. ¶ 22B; Pet's Aff & Mem, Ground Two; see also Reply at p 6-7. The Appellate Division rejected this claim on the merits.[6] See Resp't Appendix A at 1. As discussed below, this claim provides no basis for habeas relief.

A chain of custody argument presents a question of State evidentiary law that generally is not amenable to habeas review. Gonzalez-Pena v. Herbert, 369 F. Supp.2d 376, 387 (W.D.N.Y. 2005) (citing Estelle v. McGuire, 502 U.S. at 67-68). Under New York law, "failure to establish a chain of custody may be excused 'where the circumstances provide reasonable assurances of the identity and unchanged condition' of the evidence." People v. Julian, 41 N.Y.2d 340, 344 (1977) (quotation omitted). Moreover, both federal and state law clearly hold that a defect in the chain of custody goes to the weight of the evidence, not its admissibility. United States v. Hon, 904 F.2d 803, 810 (2d Cir. 1990) ("Once the exhibits were admitted into evidence, the alleged defects in the

---

[6]

The Appellate Division found as follows: "[w]e reject defendant's contention that Supreme Court erred in admitting in evidence the test results of blood samples taken from the interior of the vehicle driven by defendant on the date of the accident. Where, as here, the circumstances provide reasonable assurances of the identity and unchanged condition of the evidence, any deficiencies in the chain of custody go to the weight of the evidence and not its admissibility." Resp't Appendix A at p 1.

government's chain of custody proof were for the jury to evaluate in its consideration of the weight to be given to the evidence."); People v. Julian, 41 N.Y.2d at 344 ("While the deficiencies in the chain of custody may certainly be used to discredit the weight of the real evidence, those deficiencies were not sufficient to render that evidence inadmissible.").

Accordingly, the Court finds that Petitioner's chain of custody claim is not amenable to habeas review, and therefore denies it on this basis.

**3.   Ground Three**

Petitioner claims, as he did in his motion to vacate, that the prosecution failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Specifically, he asserts that subsequent to his conviction, he discovered that the prosecution withheld exculpatory evidence -- namely, information that Kelly, a known and self-proclaimed drug user, was allowed to sleep inside the building at L&V Automotive and had possible access to cars parked on the lot. Petitioner asserts that this "newly discovered evidence" would have supported his contention that he did not ingest cocaine, and, as such, provide an alternative explanation for the source of the narcotic found in his blood stains, i.e., that said narcotic was introduced into the vehicle after the accident. See Pet. ¶ 22C; Pet's Aff & Mem, Ground Three. The Monroe County Court denied Petitioner's "newly

-27-

discovered evidence" and <u>Brady</u> claims on the merits.[7]  <u>See</u> Resp't Appendix K.  As discussed below, these claims are meritless.

Under <u>Brady</u>, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material" to the accused's guilt or punishment.  373 U.S. at 87.  "There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999) (citing <u>Brady</u>, 373 U.S. at 87); <u>see also, e.g.</u>, <u>United States v. Coppa</u>, 267 F.3d 132, 140 (2d Cir. 2001).  Moreover, even if evidence is material and exculpatory, it is not "suppressed" by the prosecution within the meaning of <u>Brady</u> "if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."  <u>United States v. Zackson</u>, 6 F.3d 911, 918 (2d Cir. 1993) (quoting <u>United States v. LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982), <u>cert. denied</u>, 459 U.S. 1174 (1983) (citations omitted in

---

[7] With respect to Petitioner's <u>Brady</u> claim, the Monroe County supreme court found that "[Petitioner's] application is completely spurious and lacking in merit, there being no legally supported violation of the People's disclosure obligations under <u>Brady</u>[], so as to warrant a new trial or a hearing."  The court found that "[d]enial of [Petitioner's] motion . . . based upon newly discovered evidence . . . is likewise required for the same reasons justifying denial of his <u>Brady</u> violation argument.  Not only did the [Petitioner] fail to make a showing of due diligence with respect to his claim of newly discovered evidence, but the evidence was not such that it would probably change the result[.]"  <u>See</u> Resp't Appendix K at p 7-8.

Zackson)); <u>accord, e.g.</u>, <u>DiSimone v. Phillips</u>, 461 F.3d 181, 186 (2d Cir. 2006).   The government is not required to disclose evidence to a defendant "who is 'on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony he might furnish.'"   <u>Id.</u> (quoting <u>United States v. Stewart</u>, 513 F.2d 957, 960 (2d Cir. 1975).

In this case, Petitioner's alleged <u>Brady</u> violation is specious.   Even assuming the information obtained by the People from Kelly was favorable to Petitioner (a finding this Court does not make), Petitioner has not and cannot establish that the evidence was suppressed by the prosecution.   This is fatal to his claim.   Clearly, at trial, Petitioner had knowledge of the essential facts surrounding Kelly's drug use and potential access to cars at L&V Automotive because it was defense counsel who obtained and elicited said information from Bevilaqua (the owner of L&V Automotive) on cross-examination. T.T. 382-383.   Whatever information, if any, Petitioner may not have known regarding Kelly's use of cocaine was readily available to him by simply interviewing him and/or calling him as a witness, thereby permitting Petitioner to take advantage of any exculpatory evidence that Kelly may have provided.   Accordingly, it cannot be said that the prosecution "suppressed" the evidence under <u>Brady</u>.   As such, Petitioner has failed to establish a <u>Brady</u> violation, and his claim is therefore denied.

Finally, Petitioner's related "newly discovered evidence claim" based on the information related to Kelly is also without merit.  "A claim 'based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'"  Ortega v. Duncan, 333 F.3d 102, 108 (2nd Cir. 2003) (quoting Herrera v. Collins, 506 U.S. 390, 400 (1993) (citing Townsend v. Sain, 372 U.S. 293, 317 (1963), for the proposition that evidence that could not have been presented in the state proceedings "must bear upon the constitutionality of the applicant's detention").  Petitioner's claim must fail as the only constitutional violation alleged, the Brady violation discussed above, is without merit.  Thus, Petitioner's due process rights have not been infringed so as to support a claim for "newly discovered evidence."  See Duncan 333 F.3d at 108.

In sum Petitioner's Petitioner's "newly discovered evidence" and Brady claims are meritless.  The state court's adjudication of these claims did not contravene or unreasonably apply clearly established law.  Nor can it be said that the state court's determination of these claims was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  The claims are therefore denied.

**4.   Ground Four**

Petitioner argues, as he did on direct appeal, that "after conducting [the] Frye hearing, the decision of the State Court to admit unreliable and novel scientific opinion evidence of a kind generally not accepted in the field to establish that the Petitioner has possessed and ingested cocaine was prejudicial error which deprived [him] of his right to a fair trial" under the federal and state constitutions.   Pet's Aff & Mem at p 54; Pet. ¶ 22D; see also Reply at p 2-4.   The Appellate Division rejected this claim on the merits.   See Resp't Appendix A at p 1-2.   As discussed below, this claim is meritless and does not warrant habeas relief.

Initially, "[i]ssues regarding the admissibility of evidence in state court concern matters of state law and are not subject to federal review unless the alleged errors are so prejudicial as to constitute fundamental unfairness." McCray v. Artuz, 93 Civ. 5757, 1994 U.S. Dist. LEXIS 15602, 1994 WL 603057, at *2 (S.D.N.Y. Nov. 3, 1994).   A petitioner seeking habeas relief from an allegedly erroneous evidentiary ruling bears the burden of establishing that the evidentiary error deprived the petitioner of due process because it was so pervasive that it denied the petitioner a fundamentally fair trial.   See Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985).   Petitioner has not and cannot meet this standard.

In New York, the test for admissibility of scientific evidence remains the Frye test of whether a particular procedure is generally accepted as reliable within the scientific community. See, e.g., People v. Wernick, 89 N.Y.2d 111, 117 (1996) (recognizing the "need for a Frye . . . hearing in all instances when a party seeks to present novel scientific or psychiatric or medical evidence"); People v. Wesley, 83 N.Y.2d 417, 422 & n.2 (1994) ("the test pursuant to Frye v. United States . . . poses the elemental question of whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally"; noting also that while the Daubert test is now used in federal trials, New York continues to use the Frye test).

The record before this Court reflects that Petitioner requested, and was given, a Frye hearing prior to trial, "as regards the testing techniques performed on dried blood and/or swabs obtained from an airbag located within the vehicle allegedly driven by [Petitioner]." T.T. 1810.

At the Frye hearing, Dr. Beno testified that "the only difference" with dried blood was the need to dissolve it. She stated that "[y]ou either can or you can't. If you can't dissolve it[,] you won't get any results in the end." T.T. 112. She also stated that dissolving samples is "common" in toxicology. T.T. 158. She explained that, if the sample can be dissolved, the

testing proceeds by the "GC-MS and/or LC-MS-MS" technique. Dr. Beno testified further that it is "standard procedure that [the lab] does a thousand times a year for analyzing cocaine." T.T. 114. Although Dr. Beno explained that it was "unusual" to use dried blood, she also explained that the scientific principles and techniques involved in extracting the needed data were unremarkable. T.T. 117. Additionally, Dr. Beno testified that a drug cannot be created where it does not exist and the issue instead was "know[ing] how efficiently you will be able to get that drug back into solution so you can quantitate it or identify it." T.T. 103. She explained that, in conducting her testing, she made control samples with known amounts of cocaine and cocaine metabolites, which she then dried and redissolved. T.T. 141.

Based on Dr. Beno's unrefuted hearing testimony, the trial court reasonably found that Dr. Beno's test results were determined by using generally acceptable laboratory procedures, and, therefore, that the results of the GC/MS and LC/MS/MS tests performed by Dr. Beno and her laboratory were admissible at the trial. T.T. 1813-1816.

Subsequently, at trial, Dr. Beno also testified that the cocaine found in the blood samples taken from Petitioner's car suggests that cocaine was present in Petitioner's bloodstream prior to the accident. T.T. 1227-1228. Petitioner argues that the trial court erred in allowing this testimony because her "opinion

testimony was based on a novel, never before attempted laboratory procedure." Pet's Aff & Mem at p 50. The Court rejects this argument because there was nothing novel or innovative about the methods used to collect and analyze the blood evidence in this case (as discussed above), and Dr. Beno's opinion was based on the results of her testing. As such, any alleged weaknesses or deficiencies in Dr. Beno's testimony related to her testing procedure and/or her conclusions flowing therefrom were relevant to the credibility and weight of the evidence, not to its admissibility under <u>Frye</u>. <u>See</u> <u>generally</u> <u>People v. Garcia</u>, 299 A.D.2d 493, 493 (2d Dept. 2002) (weaknesses in expert's testimony went to credibility and weight of the evidence rather than to admissibility) (internal citations omitted).

The Court also rejects Petitioner's contention that the state court's adjudication of this claim contravened or unreasonably applied <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993). <u>See</u> Pet's Aff & Mem at p 50, 53, 74; Reply at p 2. Simply, <u>Daubert</u> has no application to this case. In <u>Daubert</u>, the United States Supreme Court held that expert testimony is admissible under the Federal Rules of Evidence if it is based upon scientific knowledge and it will assist the trier of fact to understand or determine a fact in issue. <u>Daubert</u> involved the scope of the Federal Rules of Evidence, as opposed to the state

evidentiary ruling at issue here.  Accordingly, the Court rejects Petitioner's argument.

In sum, Petitioner's claim is meritless and does not warrant habeas relief.  The state court's adjudication of this claim did not contravene or unreasonably apply clearly established Supreme Court law.  Nor can it be said that the state court's determination was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Accordingly, the claim is denied in its entirety.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.  Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.

Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      June 19, 2013
            Rochester, New York